IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Blakeslee Arpaia Chapman, Inc.          :
                                        :          Civil Action No. L-03-2737
            v.                          :
                                        :
The Whiting-Turner Contracting Co.      :

**MEMORANDUM**

Pending in this breach of contract suit is defendant The Whiting-Turner Contracting

Company's ("Whiting-Turner" or "Defendant") Motion for Summary Judgment.  The parties

have fully briefed the issues, and the Court held two hearings on the motion.  For the reasons set

forth below, the Court will, by separate Order, (i) GRANT Defendant's motion, (ii) ENTER

judgment in favor of Defendant, and (iii) DIRECT the Clerk to CLOSE the case.

**I.      Brief Description of the Case**

This case involves a dispute arising from a construction trade subcontract between

Whiting-Turner and plaintiff Blakeslee Arpaia Chapman, Inc. ("Blakeslee" or "Plaintiff").

Whiting-Turner was the Construction Manager for a new building for the Yale University

School of Medicine in New Haven, Connecticut ("the Project").  As Construction Manager,

Whiting-Turner was responsible for hiring trade subcontractors and for supervising and

coordinating their work.  (See Def's Mot. for S.J., Ex. D.)

On March 24, 2000, Whiting-Turner entered into a trade subcontract with Blakeslee.

(See Blakeslee Subcontract, Def's Mot. for S.J., Ex. E.)  The subcontract called for Blakeslee to

build concrete footings, foundation walls, and a precast concrete tunnel.  (Id.)

The relationship between Blakeslee and Whiting-Turner was troubled from the outset.

The spring of 2000 was unseasonably warm and dry, allowing the excavating contractor to finish

digging out the site four weeks ahead of schedule.  As permitted by the subcontract, Whiting-Turner ordered Blakeslee to start work several weeks early, on May 6th rather than early June.

Blakeslee had difficulty mobilizing, fell behind, and in Whiting-Turner's view, could not complete its work in the time allotted.  As permitted under the subcontract, Whiting-Turner withdrew a portion of Blakeslee's work and turned it over to another contractor.  Later, in August 2000, Blakeslee was preparing to start work on a precast tunnel when workers unexpectedly discovered a live sewer line.  Sorting out this problem, which was not Blakeslee's fault, caused a delay in building the tunnel.

On November 7, 2002, Blakeslee sued Whiting-Turner in the United States District Court for the District of Connecticut.  Blakeslee's complaint advanced nine counts, including breach of contract, unjust enrichment, commercial libel, and a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g (commonly known as "CUPTA").  Blakeslee demanded $6.5 million in damages.

Whiting-Turner moved to transfer venue to the District of Maryland.  On August 29, 2003, District Judge Dominic J. Squatrito granted Whiting-Turner's motion, citing the subcontract's forum selection clause, which states:

> This Trade Contract shall be governed by the laws of the State of Maryland, without regard to principles of conflict of laws.  Any action or suit arising hereunder shall be brought in the jurisdiction where Construction Manager's principal office is located[1] without regard to principles of conflict of laws or forum non conveniens.  In the event of litigation between them, Construction Manager and Contractor waive trial by jury.

---

[1]  The "Construction Manager" is Whiting-Turner, which is a Maryland corporation with its principal place of business in Maryland.

(Def's Mot. for S.J., Ex. E, Art. 9(t); id., Ex. X.)  In his transfer order, Judge Squatrito noted that

Maryland law applies to the case.[2]

        Following transfer, the Court set a schedule that allowed ample time for discovery.

Despite this, Blakeslee repeatedly fell behind, missed deadlines, and broke commitments.  In

November 2005, on the eve of a deadline, Blakeslee's counsel moved to withdraw.  Blakeslee's

new attorneys blamed the failures on outgoing counsel and promised to provide full discovery if

the Court would extend the deadline rather than dismiss the case.  The Court reluctantly agreed,

but on the "explicit understanding" that the case would be dismissed with prejudice if Blakeslee

failed to meet its discovery, briefing, and expert witness obligations in a timely manner.

        The Court held a hearing to review Blakeslee's claims with new counsel and specify their

discovery obligations.  In a February 3, 2006 confirmatory Order, the Court stated that

"Blakeslee's damages fall under four heads: (1) unpaid work under the base contract; (2) unpaid

extras and change orders; (3) increased cost to perform, including overhead, based on Whiting-

Turner's interference and non-cooperation; and (4) excessive deductions for work deleted from the

contract."  (Docket No. 100.)  The Court directed Blakeslee to (i) provide Whiting-Turner "with a

detailed breakdown of the damages claimed under each of the four categories," (ii) "state whether

Blakeslee is pursuing the commercial libel and CUPTA counts" and if so, provide Whiting-Turner

"with a detailed breakdown of the damages," and (iii) "file an amended complaint."  (Id.)

        As directed, on February 23, 2006, Blakeslee filed an amended complaint, which sets forth

two causes of action:  (i) breach of contact and (ii) unjust enrichment.  (Docket No. 109.)  Also on

_____

        [2]  See Def's Mot. for S.J., Ex. X, at 8 ("Finally, the Court notes that the trade
contract at issue in this case provides that Maryland law will apply to any disputes arising
under the contract. . . .  Clearly the District of Maryland, rather than the District of
Connecticut, would have more familiarity with the law applicable to this case.").

3

February 23, 2006, Blakeslee's new attorney sent Whiting-Turner's counsel a letter explaining

Blakeslee's damages calculations and explicitly withdrawing Blakeslee's libel and CUPTA counts.

(Def's Mot. for SJ, Ex. C.)

As stated in the letter, Blakeslee significantly scaled down its damages claim from $6.5

million to $2.05 million, as follows:

- Unpaid retainage ($106,529.81)

- Unpaid extras ($87,267.15)

- Increased costs to perform ($941,029)

- Excessive deduction for the work Whiting-Turner withdrew from Blakeslee (in the amount of $629,115 if the work was deleted as the result of Blakeslee's default or $918,102.72 if the work was deleted for the convenience of Whiting-Turner)

(Id.)

Discovery finally concluded, and, on April 21, 2006, Whiting-Turner filed the instant

Motion for Summary Judgment.  (Docket No. 114.)  In it, Whiting-Turner contends that

Blakeslee failed to satisfy contractual conditions required in order for Blakeslee to recover the

unpaid retainage or to make a claim for damages.

Regarding the first category of damages, Whiting-Turner argues that Blakeslee's claim

for unpaid retainage is barred because Blakeslee failed to give Whiting-Turner certain

documents that are required before the retainage can be released.  Regarding the second, third,

and fourth category of damages, Whiting-Turner contends that Blakeslee failed to provide

Whiting-Turner with (i) timely written notice of each claim, and (ii) prompt, detailed

documentation and calculations in support of each claim, as is required by the Blakeslee

Subcontract.

Blakeslee opposed Whiting-Turner's motion, but withdrew its unjust enrichment count. Accordingly, Blakeslee seeks the four categories of damages under a breach of contract theory.

The Court held two hearings on the motion. For the reasons set forth below, the Court will grant Whiting-Turner's motion, enter judgment for Whiting-Turner, and close the case.

## II.     Standard of Review

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. Pulliam Inv. Co. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987).

## III.    Analysis

Each of the four categories of damages sought by Blakeslee concerns a different dispute that arose between Blakeslee and Whiting-Turner during work on the Project. Accordingly, the Court will, in turn, discuss the facts and various documents applicable to each claim.

### A.      Unpaid Retainage (First Claim)

In its first claim, Blakeslee seeks the amount of retainage ($106,529.81) that Whiting-Turner withheld from its subcontract payments.[3]  It is undisputed that the Blakeslee Subcontract requires Blakeslee to submit the following documents to Whiting-Turner before the retainage is released: (i) a final set of as-built drawings, (ii) an executed final release and affidavit, (iii) waivers and releases for second tier subcontractors and suppliers, and (iv) a fully executed guaranty and warranty form.[4]  (Def's Mot. for S.J., Affidavit of John G. Giovannone (hereinafter "Giovannone Aff."), ¶ 28; Def's Mot. for S.J., Ex. U, Part Four, p. 10, ¶ 6.4; id., p. 13, ¶ 11.1; Def's Mot. for S.J., Ex. V, Part Eight, p. 1, ¶ 3.)  Although Blakeslee has not provided these documents to Whiting-Turner, it argues that it should be excused from doing so.  The Court disagrees.

### 1.    Final Set of As-Built Drawings

It is undisputed that Blakeslee never furnished Whiting-Turner with a set of as-built drawings.  Blakeslee claims that Whiting-Turner hired a firm, Kratzert Jones and Associates, Inc. ("K&J"), to perform the as-built survey and to submit the final set of drawings to Whiting-Turner.  (Pl's Opp'n to Mot. for S.J., Ex. 5, Declaration of David Chapman, P.E. (hereinafter "Chapman Decl."), ¶ 39.)  Whiting-Turner counters that K&J was a surveying company that Whiting-Turner hired early in the Project to provide "control lines" and "offsets" that each trade subcontractor would need in order to carry out its work.  K&J did not prepare as-built drawings, which are created after the work is completed, Whiting-Turner contends.  Whiting-Turner also

---

[3]  "Retainage" is a percentage of the contract price that is withheld pending completion of the work.  (Pl's Opp'n to Mot. for S.J., Ex. 5, ¶ 36; see also http://www.dictionary.com and search for "retainage").

[4]  Blakeslee does not challenge Whiting-Turner's contention that the submission of these documents is a condition precedent to release of the retainage.

claims that it never relieved Blakeslee of its contractual obligation to provide the as-built drawings.  (Def's Reply to Mot. for S.J., Reply Affidavit of John G. Giovannone (hereinafter "Giovannone Reply Aff."), ¶ 29.)

Blakeslee failed to offer any evidence from which a reasonable jury could conclude that it was relieved of its obligation to submit as-built drawings.  Blakeslee did not include in the record Whiting-Turner's contract with K&J or any documentation from K&J describing the scope of the work that K&J was hired to perform.  There is, therefore, no evidence that Whiting-Turner hired K&J to prepare the as-built drawings.  In addition, Blakeslee did not cite to any correspondence or other documentation stating that Whiting-Turner agreed that Blakeslee was relieved of its obligation to prepare and submit as-built drawings. In fact, in a February 22, 2002 letter,[5] Whiting-Turner specifically stated that it never relieved Blakeslee of its obligation to submit the drawings and asked Blakeslee to provide the drawings within ten business days.  (Pl's Opp'n to Mot. for S.J., Ex. PP.)  Blakeslee failed to do so.

**2.     Waivers and Releases for Second Tier Subcontractors and Suppliers**

In a letter dated February 13, 2002, Blakeslee stated that it was obtaining Final Waivers and Releases for Second Tier Subcontractors and Suppliers and that it would forward them to Whiting-Turner as soon as they were received.  (Pl's Opp'n to Mot. for S.J., Ex. QQ.)  Other than citing to this letter, Blakeslee does not discuss these waivers and releases and offers no evidence that it ever provided the documents to Whiting-Turner as promised.

**3.     Final Release and Affidavit/ Final Guarantee and Warranty**

---

[5] Although the letter is dated "February 22, 2001," it refers to a February 14, 2002 letter written by Blakeslee.  It is, therefore, clear that the letter was actually written in the year 2002, not 2001.

The subcontract requires Blakeslee to provide (i) a final release and affidavit and (ii) a final guarantee and warranty.  Blakeslee states that it is concerned that if it signs these documents, Whiting-Turner will then argue that Blakeslee has released Whiting-Turner from liability for all of Blakeslee's claims.  Blakeslee, therefore, refuses to execute the documents while the instant litigation is pending.

Blakeslee's concern may justify a failure to execute the final release and affidavit.  It does not, however, justify a failure to guarantee the work in accordance with the contract.  Moreover, John G. Giovannone, Whiting-Turner's Senior Project Manager assigned to the Project and current Vice-President, testified that it is industry practice to execute the documents and include a statement to the effect that the subcontractor reserves all claims that it currently has pending against Whiting-Turner.  (See Giovannone Reply Aff., ¶ 28.)  Blakeslee has not rebutted Mr. Giovannone's testimony.

In addition, Blakeslee offers no legal theory under which it should be paid the retainage despite having failed to comply with the conditions precedent to payment.  Accordingly, its claim fails.

### B.        Remaining Claims: Unpaid Extras, Increased Costs, Excessive Deductions

The Blakeslee Subcontract provides:

> In the event of any dispute, controversy, or claim for additional compensation or time extensions, notice in writing shall be given to the Construction Manager no later than seven (7) days following the occurrence on which claim is based.  Such notice shall describe the dispute, controversy or claim in detail so as to allow Construction Manager to review its merits.  Any claim not presented within such time period shall be deemed waived by Contractor.  Promptly thereafter, Contractor shall provide detailed information to substantiate such claim including supporting documentation and calculations, and including any information requested by Construction Manager.

(Def's Mot. for S.J., Ex. E, Art. 6(e) (emphasis added).)  Whiting-Turner contends that

Blakeslee's remaining claims are barred because Blakeslee failed to provide Whiting-Turner

with the contractually required seven-day written notice of the claim and/or with prompt,

detailed supporting documentation and calculations.[6]  Accordingly, Blakeslee has waived its

claims, Whiting-Turner argues.

Blakeslee contends that it did provide timely written notice and supporting

documentation and that, even if it did not, such failure should not bar its claims.  First, the Court

will address, for each claim, whether Blakeslee complied with the notice and substantiation

requirements in the subcontract.  Then, the Court will turn its attention to Blakeslee's argument

that, even if it failed to comply with those requirements, its claims should still go forward.

### 1.    7-Days Notice and Prompt Substantiation

#### a.    Unpaid Extras (Second Claim)

In its second claim, Blakeslee seeks $87,267.15 to reimburse it for costs that it incurred

in performing extra work.  In order to sustain this claim, Blakeslee must demonstrate that it gave

---

[6]  Whiting-Turner's contract with Yale provides that Whiting-Turner must substantiate its claims against Yale within thirty days after providing notice thereof. (Def's Mot. for S.J., Ex. D. Art. 4.3.3.)  Because the Blakeslee subcontract states that Blakeslee is entitled to no greater rights or remedies than Whiting-Turner has against Yale (Def's Mot. for S.J., Ex. E, Art. 9(f)), Whiting-Turner invites the Court to substitute the thirty-days limit in the Yale contract for the "promptly thereafter" language in the subcontract.  For two reasons, the Court declines Whiting-Turner's invitation.  First, the "promptly thereafter" language is specifically contained in the subcontract that Blakeslee signed.  Second, the "promptly thereafter" standard is more flexible and, therefore, more advantageous to Blakeslee.

notice to Whiting-Turner within seven days of the work being done, that the notice described the claim in detail, and that Blakeslee provided supporting documentation and calculations promptly thereafter.

Blakeslee has completely failed to meet this requirement.  At no point, not even in its briefing or at the summary judgment hearing, has Blakeslee described and supported with any clarity its extras claim.

It is undisputed that Blakeslee's work on the Project was completed as of August 31, 2001, meaning that the extra work for which it seeks payment necessarily took place prior to that date.  In order to establish that it satisfied the notice requirement, Blakeslee cites to ten letters that it wrote to Whiting-Turner between May 17, 2000 and June 6, 2001.  (See Pl's Opp'n to Mot. for S.J., Exs. E-N.)  Some of these letters are irrelevant.  Several, however, do state that Blakeslee was incurring extra costs and would be making a claim.

On October 2, 2001, Blakeslee submitted a "claim book" with a cover sheet that states: "Included is a notebook describing and costing extra work we have performed on this project." (Def's Mot. for S.J., Ex. J.)  The "claim book" includes a one-page sheet stating the following:

| | |
|---|---|
| Tunnel Work | $ 103,068.74 |
| Loading Dock | $ 39,467.81 |
| M-Line 10x10 Opening | $ 8,144.34 |
| M Line Infill | $ 19,238.45 |
| A-Line Box Outs | $ 10,600.34 |
| Cleaning | $ 4,569.90 |
| Safety | $ 720.60 |
| PR's | $ 150,200.41 |
| Misc. | $1,585,876.13 |
| Credits | $ (20,732.88) |
| | |
| Total | $1,901,153.85 |

The "claim book" does not meet the requirements of article 6(e) of the subcontract.  It nowhere describes the dispute or disputes that gave rise to the present amount in controversy ($87,267.15), nor does it provide detailed information and calculations to substantiate that claim.

There is simply no correlation between Blakeslee's present claim and the information in the "claim book."  Because the "claim book" requests $1.9 million and the present claim is for only $87,267.15, most of the claim has evaporated, either because Whiting-Turner paid for the work or because Blakeslee abandoned its claim.  At no time has Blakeslee broken down and supported its claim for $87,267.15.

Prior to the hearing of November 20, 2006, the Court wrote counsel asking them to be prepared to point to the specific documents in the record that demonstrate notice and substantiation for the $87,267.15 claim.  This counsel failed to do.  Blakeslee's attorney produced a chart, prepared specifically for the hearing, that lists the following extra work for which it has not been paid: "Miscellaneous work related to the tunnel, loading dock, M-Line Opening, M-Line Infill, A-Line Box-outs, Cleaning, Safety, other miscellaneous charges."  (See Docket No. 135, Nov. 20, 2006 Hearing Ex. 1.)  The chart references letters and other exhibits. Neither the chart nor the exhibits establishes that the purported notice was timely.  Many of the exhibits do not ascribe a dollar figure for the work.  Those that do fail to explain how the dollar figure factors into the $87,267.15 claimed.  Thus, even today, years after the extra work was performed, Blakeslee has neither described the components of its $87,267.15 claim nor provided supporting documentation and calculations.[7]

---

[7] As previously noted, in a February 23, 2006 letter, Blakeslee told Whiting-Turner's counsel that, in this litigation, it is seeking a total of $87,267.15 for extra work. Although the letter referenced an excel spreadsheet that purportedly contains backup calculations for this claim, the parties have not provided that spreadsheet to the Court.

### b.    Increased Costs to Perform (Third Claim)

In its third claim, Blakeslee seeks $941,029 for the increased costs that it allegedly incurred performing work under the subcontract.  This claim can be broken down into two categories: (i) acceleration and interference ($866,041), and (ii) tunnel delay ($74,988).   The Court will address each category in turn.

### 1)    Acceleration and Interference

Blakeslee's principal work was divided into two portions, the installation of the building foundation and the installation of slabs on grade.   Blakeslee was scheduled to perform the work over a three-and-a-half month period, from June 14 to October 2, 2000.  (Giovannone Aff., ¶ 9; Def's Mot. for S.J., Ex. F, at p. 4, lines 50, 60.)

As previously explained, because of favorable weather conditions, Whiting-Turner ordered Blakeslee to start its concrete work earlier than scheduled.[8]  The early start date required Blakeslee to prepare its drawings and complete other preparatory work in a short period of time.

Blakeslee now seeks to hold Whiting-Turner responsible for the increased costs associated with the acceleration of its start date, in addition to costs that it says it incurred as a result of Whiting-Turner's interference with its performance and failure to coordinate the work of the various subcontractors.  Blakeslee claims that its acceleration and interference costs total $866,041.

---

[8]  Blakeslee does not contend that Whiting-Turner lacked authority to accelerate the start date.

It is undisputed that Blakeslee's acceleration and interference claim is based solely on events that took place no later than October 2000.[9]   Accordingly, in order to sustain its claim, Blakeslee must demonstrate that it gave notice to Whiting-Turner no later than seven days after October 31, 2000, that the notice described the claim in detail, and that Blakeslee provided supporting documents and calculations promptly thereafter.

In an attempt to establish that it provided timely notice of its claim, Blakeslee cites to fifteen letters.  (Chapman Decl., Exs. A, B, F, I, J, K, M, N, U, V, W, X, Y, Z, LL.)  Two of the letters were written in 2001 and, to the extent they might constitute notice, they are untimely. (Chapman Decl., Exs. M, N.)  The remaining letters were all timely, having been written prior to October 2000.  Some of those letters, however, do not appear to relate to interference or acceleration.  Rather, they discuss Blakeslee's extra work and the delay in completing the precast tunnel.  Other letters do pertain to the instant claim, stating that Blakeslee intends to seek reimbursement for interference and acceleration costs.[10]   None of them, though, assign any monetary value to Blakeslee's claim.

---

[9]  See Def's Mot. for S.J., Ex. J ( October 2001 "claim book" stated that Blakeslee had "not included costs for work associated with acceleration and interference last year"); id., Ex. K (confirming that costs for acceleration and interference were incurred in 2000); id., Ex. L (confirming that the work was completed in October 2000).

[10]  See Chapman Decl., Ex. F (July 5, 2000 letter stating that Blakeslee will "look to" Whiting-Turner to recover its increased costs from acceleration); id., Ex. U (June 8, 2000 letter stating that Blakeslee "will expect to receive reimbursement for those costs that are properly caused by your Order to Accelerate"); id., Ex. X (August 21, 2000 letter stating that Blakeslee is working in an area with other trades and that Blakeslee is entitled to payment for any loss of efficiency created by the stacking of trades);  id., Ex. Z (September 5, 2000 letter stating that Blakeslee will "look" to Whiting-Turner for reimbursement of costs incurred as a result of Whiting-Turner instructing Blakeslee to make room for other subcontractors inside the perimeter of the building).

Even if some of the timely letters satisfy the notice requirement, Blakeslee concedes that it did not provide any supporting calculations or documents until February 21, 2002, more than sixteen months after Blakeslee's notice.[11] (Def's Mot. for S.J., Ex. N.)[12] No reasonable jury would conclude that this was prompt. Accordingly, even if Blakeslee provided timely written notice, it did not promptly thereafter supply supporting documents and calculations as required by the subcontract.

### 2)      Tunnel Delay

In August 2000, Blakeslee was preparing to start work on a precast tunnel for the Project when workers discovered a live sewer line in the path of the work. It is agreed that it was not Blakeslee's responsibility to locate the line and, therefore, not Blakeslee's fault that the line had not previously been discovered. Whiting-Turner instructed Blakeslee to perform only limited work on the tunnel and then to hold off until receiving further instructions from Whiting-Turner.

---

[11] Roger Chapman, Blakeslee's President, stated in deposition that the February 21, 2002 "final billing" was the first time that Blakeslee submitted its interference claim to Whiting-Turner in writing. (Def's Mot. for S.J., Ex. O.) Also, the chart that Blakeslee's counsel provided to the Court at the November 20, 2006 summary judgment hearing stated that Blakeslee provided its "full detailed submission" regarding its interference and acceleration claim on February 21, 2002. (See Docket No. 135, Nov. 20, 2006 Hearing, Ex. 1.) In its brief opposing summary judgment, Blakeslee does not argue that it provided supporting documents or calculations prior to February 21, 2002.

[12] On February 21, 2002, Blakeslee submitted a "final billing" to Whiting-Turner. Item 10 of the "final billing" is titled "Interference by Whiting-Turner" and lists an amount of $954,268.13. (Def's Mot. for S.J., Ex. N.) That amount has since been reduced to the current total of $866,041.

Whiting-Turner invited Blakeslee to submit its costs associated with the interruption of work, some of which Whiting-Turner apparently paid.  (Chapman Decl., Ex. J.)

Blakeslee now seeks to recover extended field and home office overhead, in the amount of $74,988, that it incurred as a result of the delay.  According to Blakeslee, the "delay period" during which this overhead accrued lasted from March 31 to July 29, 2001.  (Def's Mot. for S.J., Ex. P (Blakeslee spreadsheet).)  Accordingly, the event on which its delay claim is based took place no later than July 29, 2001.

Whiting-Turner contends that it was not until February 23, 2006, more than four years later, that it first received written notice of Blakeslee's delay claim and any supporting calculations.  That is the date on which Blakeslee's counsel, as ordered by the Court, sent Whiting-Turner's counsel a letter explaining Blakeslee's damages calculations.  Attached to the letter was a spreadsheet that itemizes Blakeslee's overhead costs, which total $74,988.  (Def's Mot. for S.J., Ex. P, p. 1.)

In an attempt to establish that it provided timely notice of its claim, Blakeslee cites to thirteen letters, written between August 8, 2000 and September 10, 2001.  (Chapman Decl., Exs. J, K, L, O, P, Q, Y, BB, CC, DD, EE, FF, and GG.)  Some of these letters do not even mention the tunnel delay.  Rather, they appear to be seeking payment for extra work.  Many of the letters that do mention the tunnel simply state that Blakeslee will be claiming delay costs; they do not state the amount of the costs.  The letters that do mention an amount specifically state that the

amount does not include overhead.[13]  Despite these defects, the Court, nevertheless, will assume arguendo that the letters constitute detailed notice as required under the subcontract.

Blakeslee does not contend (nor could it show) that the letters include the required supporting calculations.  Rather, Blakeslee argues that it first provided its calculations to Whiting-Turner in its October 2, 2001 "claim book."  Blakeslee cites to a page in the "claim book" that lists a miscellaneous charge of $1.5 million.  (See Docket No. 135, Nov. 20, 2006 Hearing Ex. 1; Chapman Decl., Ex. D.)  There is no explanation, however, regarding the miscellaneous charge, and the excerpt of the "claim book" to which Blakeslee cites does not describe the disputes that gave rise to Blakeslee's present $74,988 claim.

Blakeslee also contends that its "claim book" referenced a $1.4 million delay claim for extended field and home office overhead for the period November 1, 2000 to August 31, 2001. Blakeslee, however, has not provided the Court with the relevant excerpt of the "claim book."  It, therefore, cannot show (i) that the book even mentioned the delays attributed to the tunnel, or (ii) that the book included detailed calculations to show Whiting-Turner that $74,988 of the $1.4 million was attributed to the tunnel delay.[14]  There is, therefore, no correlation between Blakeslee's present $74,988 claim and the $1.4 million delay discussed in the "claim book."

---

[13]  The October 13, 2000 letter addresses the tunnel delay but specifically states that it "does not include extended home office overhead that will be computed and billed once the tunnel is complete."  (Chapman Decl., Ex. O.)  Likewise, a September 10, 2001 letter states "this Extra Work does not include extended home office overhead and extended field office costs.  These costs will be submitted separately."  (Id., Ex. Q.)

[14]  Exhibit I to the Giovannone Affidavit contains a chart listing extended field office overhead from November 1, 2000 to August 31, 2001.  The figures in the chart total $94,569.35.  It, therefore, does not appear to be the portion of the "claim book" to which Blakeslee refers.  Even if it is, there is no mention in the chart of delays.

Thus, it was not until February 23, 2006, more than four years after the tunnel delay ended, that Whiting-Turner received supporting calculations regarding this claim. No reasonable jury could conclude that this was prompt.

### c.     Excessive Deduction (Fourth Claim)

In June 2000, Whiting-Turner informed Blakeslee that it planned to give a portion of Blakeslee's work on the Project to another contractor and that it would "back charge" Blakeslee for the work. The Blakeslee Subcontract allowed Whiting-Turner to assign some of Blakeslee's work to another contractor, and it provided that the amount of the back charge would vary depending on whether the work was deducted for the convenience of Whiting-Turner or because Blakeslee was in default. (Def's Motion for S.J., Ex. E, Arts. 6(d), 7(b).) Under Article 6(d), if the work was deleted under a convenience theory, the total back charge would equal the value of the deleted work, including overhead and profit attributable to such work. Under Article 7(b), if the work was deleted under a default theory, the total back charge would equal Whiting-Turner's cost to procure completion of the work.

After competitive bidding, Whiting-Turner hired Manafort Brothers, Inc. ("Manafort") to complete the work and paid it $1,429,115. On October 11, 2000, Whiting-Turner issued a contract supplement to Blakeslee. The supplement stated that Blakeslee was in default and that, pursuant to Article 7(b), Whiting-Turner was deducting $1,429,115 (the amount it had paid Manafort) from the balance that it owed to Blakeslee. (Giovannone Aff., ¶ 22 & n.7; Def's Mot. for S.J., Ex. S.) The supplement contained the following breakdown of the deleted work and its corresponding value: Item 1  - "Deletion of the Slab on Grade" ($469,615) and Item 2 -

"Deletion of work in Blocks 3 & 5 LL1, Pits, Ftgs., & Foundation walls" ($959,500), for a total of $1,429,115.[15] (Def's Mot. for S.J., Ex. S.)

Blakeslee challenges the amount that Whiting-Turner back charged it for the work awarded to Manafort.  Specifically, Blakeslee contends that the work was deleted for Whiting-Turner's convenience, not because Blakeslee was in default.  According to Blakeslee, under a convenience theory, the correct amount of the back charge is $511,012.28 (the value of the work, plus overhead and profit).  Whiting-Turner, therefore, overcharged Blakeslee $918,102.72 (the $1,429,115 actual back charge minus the $511,012.28 correct back charge), Blakeslee contends.

In the alternative, Blakeslee argues that even if the work was properly deleted because Blakeslee was in default, the reasonable cost of procuring replacement work should have been no more than $800,000.  Accordingly, under a default theory, Whiting-Turner overcharged Blakeslee $629,115 (the $1,429,115 actual back charge minus the $800,000 correct back charge).  Thus, in the instant lawsuit, Blakeslee seeks, in the alternative, $629,115 under a default theory or $918,102.72 under a convenience theory.[16]

### 1)      Applicability of Notice/Substantiation Provision To Excessive Deduction Claim

At the November 20, 2006 summary judgment hearing, Blakeslee argued for the first time that its excessive deduction claim is not governed by the notice and substantiation provision

---

[15]  The supplement also listed a third item, which was not part of the deleted work and is not relevant to the instant motion.

[16]  Whether Whiting-Turner properly back charged Blakeslee under a default theory, as opposed to a convenience theory, is not at issue in the instant motion for summary judgment.

of the subcontract.  Blakeslee contends that the provision only applies to claims for additional

compensation and not to a dispute regarding the deletion of work.

Blakeslee, however, ignores the fact that the notice and substantiation provision

expressly states that it applies to disputes and controversies in addition to claims for additional

compensation.  (Def's Mot. for S.J., Ex. E, Art. 6(e) (stating that notice and substantiation must

be provided in "the event of any dispute, controversy, or claim for additional compensation or

time extensions").)  Boiled to its essence, Blakeslee's excessive deduction claim is a dispute over

the amount of money that Whiting-Turner back charged Blakeslee for the work that it deducted.

Such a dispute is encompassed within the notice and substantiation provision.

Supporting this conclusion is the fact that Article 6, in which the notice provision is

found, is not limited to additional work.  Rather, it is titled "Changes in the Work" and

specifically references "deletion of work."  (Id., Art. 6, Title, Art. 6(a).)  Moreover, Article 6

also contains the formula for calculating a back charge based on a convenience theory, the exact

theory that Blakeslee argues applies in this case.  (Id., Art. 6(d).)  Accordingly, the notice and

substantiation provision applies to Blakeslee's excessive deduction claim.

### 2) Notice/Substantiation

The parties do not dispute that October 11, 2000, when Whiting-Turner notified

Blakeslee that it was back charging $1,429,115, was the latest possible date on which the events

giving rise to this claim occurred.  Whiting-Turner contends that Blakeslee did not (i) assert its

excessive deduction claim based on a convenience theory until its February 21, 2002 "final

billing letter," and (ii) assert its excessive deduction claim based on a default theory until its

February 23, 2006 letter to counsel detailing the damages it seeks in the instant litigation.  Thus,

the "convenience"-based notice and substantiation was more than a year late, and the "default"-based notice and substantiation was more than five years late, Whiting-Turner contends.

Blakeslee and Whiting-Turner discussed the deletion of the work on various occasions prior to October 11, 2000.  (Chapman Decl., Exs. F, BB, II, JJ, KK, LL, MM, NN, OO.)  The Court, therefore, will assume that Blakeslee provided bare notice to Whiting-Turner that it disputed the back charge.

Blakeslee concedes, however, that before February 21, 2002, it never explicitly stated the amount of the back charge that it contends was proper.[17]  Rather, Blakeslee claims that Whiting-Turner should have been able to extrapolate Blakeslee's position from several documents.  One such document is a July 12, 2000 letter from Blakeslee's President, Roger S. Chapman, to Whiting-Turner.  The letter states: "We will allow a credit to our Lump Sum Price of <u>271,000 dollars</u> for the deletion of the slab on grade including the joints, the reinforcing and the waterproofing."  (Chapman Decl., Ex. II (emphasis in original).)  The $271,000 credit was for only the slab on grade portion of the deleted work.  (Giovannone Reply Aff., ¶ 15, n.2.)  The letter did not discuss the other part of the deleted work, <u>i.e.</u>, the "work in Blocks 3 & 5 LL1, Pits, Ftgs., & Foundation walls."  In fact, the $271,000 mentioned in this letter represents only 53% of the total $511,012.28 that Blakeslee now claims was the proper back charge amount.

Blakeslee also contends that it frequently submitted applications for payment to Whiting-Turner and that those applications detailed the cost of the deducted work.  (Chapman Decl., Ex.

---

[17]  At the November 20, 2006 summary judgment hearing, Blakeslee's attorney conceded that Blakeslee did not write to Whiting-Turner after receiving the contract supplement to say that Blakeslee disputed the $1.4 million back charge and to state what Blakeslee believed to be the proper back charge amount.  (Transcript from Nov. 20, 2006 hearing, at p. 22.)

KK.)  There are fourteen separate monthly billing statements, spanning from August 25, 2000 to December 20, 2001, that Blakeslee sent to Whiting-Turner.[18]  Each application consists of two pages: (i) a summary and signature page, and (ii) a chart listing, for each item of work, how much of that work (stated in terms of monetary value) (a) has been completed and (b) still needs to be performed.  (Id.)

At the November 20, 2006 summary judgment hearing, Blakeslee's counsel admitted that "it requires some mathematical efforts" to extrapolate Blakeslee's position regarding the proper value of the back charge from the monthly billings.  (Transcript from Nov. 20, 2006 hearing, at p. 38.)  Blakeslee's counsel explained that if you look at the last billing statement, dated December 20, 2001, it shows that the following items of work had not been completed: Item 4 - Form and Pour Block 3 Footings, Item 6 - Form and Pour Block 5 Footings, Item 9 - Form and Pour Block 3 Walls, Item 11 - Form and Pour Block 5 Walls, and Item 12 - Slab on Grade.  Blakeslee claims that the figure next to each of these items reflects the unit price value of that item of work.  The figures total $554,413.80.

No reasonable jury could conclude that these monthly billing statements include the calculations required by the subcontract.  First, the statements do not mention the back charge dispute.  Second, they require Whiting-Turner to add various numbers together and surmise that the total must be the proper amount of the back charge claimed by Blakeslee.  Third, Blakeslee had previously advised Whiting-Turner of its position that the back charge should be computed under a convenience-based theory.  Under that theory, the proper amount of the back charge is the sum of the value of the work, plus overhead and profit.  Blakeslee's monthly billing

_____

[18]  The final five pages of Exhibit KK were mistakenly attached to the exhibit and are not part of the applications for payment.

statements make no mention of this formula and how the numbers stated in the statements fit therein.  Even if the amounts listed in the statements show the value of each item of work, they make no mention of overhead and profits.

Fourth, the December 20, 2001 billing statement lists the total value of the unfinished work as $554,413.80, which is more than $43,000 over the $511,012.28 that Blakeslee now claims was the proper back charge amount.  Blakeslee has not explained the discrepancy.  Fifth, even if the December 20, 2001 billing statement provided the required calculations, it was submitted to Whiting-Turner more than fourteen months after Blakeslee notified Whiting-Turner that it disputed the back charge.  No reasonable jury, therefore, could conclude that the statement was submitted promptly.[19]  Finally, in a July 5, 2000 letter, Blakeslee stated:  "[O]nce [Blakeslee] has completed its remaining work and is able to ascertain the value of the deleted work, [Blakeslee] will advise [Whiting-Turner] of that value in accordance with Article 6(d) of the Subcontract."  (Chapman Decl., Ex. F.)   It is unreasonable to expect Whiting-Turner to have interpreted the monthly billing statements, which do not mention the deletion of work, as constituting Blakeslee's promised notification regarding the value of the deleted work.

In one last attempt to save its excessive deduction claim, Blakeslee noted that it refused to sign off on the October 11, 2000 contract supplement.  Blakeslee claims that this refusal put Whiting-Turner on notice that Blakeslee did not agree with the deduction amount.  Even so, Blakeslee's silence did not notify Whiting-Turner of the amount that Blakeslee believed was proper.  Blakeslee's counsel conceded during the summary judgment hearing that, after October

---

[19]   The December 20, 2001 billing statement appears to be identical to those dated November 21, 2001, October 23, 2001, and July 20, 2001.  Even so, July 20, 2001 was nine months beyond October 11, 2000.  No reasonable jury would conclude that those statements were submitted promptly, either.

11, 2000, Blakeslee never sent a letter to Whiting-Turner stating that it disputed the back charge amount listed in the contract supplement.  (Transcript from Nov. 20, 2006 hearing, at p. 22.)

In conclusion, Blakeslee has not pointed to any documents prior to its February 21, 2002 "final billing letter" that informs Whiting-Turner of its position that the proper amount of the back charge was $511,012.28.  Likewise, it has not offered any evidence that, prior to February 23, 2006,  it ever notified Whiting-Turner of its alternative argument that $800,000 was the correct back charge under a default theory.  Accordingly, the Court concludes that Blakeslee did not provide prompt substantiation regarding its excessive deduction claim.

### 2.    Blakeslee Argues that its Claims Should Not Be Barred

Despite having failed to provide timely calculations regarding its claims, Blakeslee offers several arguments for why its claims should survive.  First, Blakeslee contends that under Connecticut law, Whiting-Turner must prove that it suffered prejudice as a result of Blakeslee's failure to provide notice and substantiation and that Whiting-Turner has failed to do so.  Second, Blakeslee argues that Whiting-Turner said that it would not entertain Blakeslee's claims and is, therefore, estopped from arguing that Blakeslee failed to timely provide its supporting calculations.  Finally, Blakeslee claims that Whiting-Turner asked Blakeslee to submit all of its costs relevant to its extra work claim by October 2, 2001 and that by doing so, Whiting-Turner amended the subcontract to establish a new deadline for the submission of calculations in support of the extra work claim.  The Court will address, and reject, each argument in turn.

### a.    Prejudice

Blakeslee spent a considerable portion of its opposition brief arguing that Connecticut rather than Maryland law applies in this case.  Blakeslee's brief, however, failed to point to any

relevant difference between Connecticut and Maryland law.  It was not until the November 20,

2006 summary judgment hearing that Blakeslee argued for the first time that under Connecticut

law, the party seeking to enforce a notice provision must demonstrate that it suffered actual

prejudice from the delay in receiving notice.  The Court need not decide whether Connecticut or

Maryland law applies because, even under the Connecticut law that Blakeslee cites, Blakeslee is

not excused from providing timely notice and calculations.

Blakeslee cited to two Connecticut cases.  The first case, Aetna Cas. & Sur. Co. v.

Murphy, 538 A.2d 219 (Conn. 1988), involved an insurance dispute.  The Supreme Court of

Connecticut stated that an insured's failure to provide timely notice of a claim to its insurance

company may be excused if "it can be shown that the insurer suffered no material prejudice from

the delay." Id. at 223.  Central to the court's decision to employ a prejudice analysis was the fact

that the notice provisions at issue were "contained in an insurance policy that is a 'contract of

adhesion,' the parties . . . having had no occasion to bargain about the consequences of delayed

notice." Id. at 222.

The second case, Twenty-Four Merrill St. Condo. Ass'n, Inc. v. Murray, 902 A.2d 24

(Conn. App. Ct. 2006), involved an action to foreclose a statutory lien for fines and repair costs

on a condominium unit owned by the defendant.  The defendant condominium owner argued that

the condominium association failed to timely notify him, as required by its bylaws, that it had

decided to impose fines for his failure to fix faulty plumbing in his unit.  In considering the

validity of the statutory lien, the court looked at whether the defendant had suffered any

prejudice as a result of the late notice of the plaintiff's decision to impose fines. Id. at 29.

Neither of these cases involves a business contract, such as the one in the instant case, that was entered into by sophisticated parties with the assistance of experienced counsel. The Aetna case involved a contract of adhesion, which is not present here. The Murray case involved a notice provision in condominium association bylaws. Accordingly, the cases are not applicable to the case at hand.

Moreover, in Connecticut, the burden falls on the party seeking to be excused from compliance with the notice requirements to show that the opposing party did not suffer any prejudice. Aetna, 538 A.2d at 224 (stating that "the burden of establishing lack of prejudice must be borne by the insured" because "[i]t is the insured who is seeking to be excused from the consequences of a contract provision with which he has concededly failed to comply"). Blakeslee made only a meager attempt to satisfy this burden, stating that a Yale representative testified that there is a contingency fund from which Whiting-Turner may pay claims of subcontractors, such as Blakeslee. (Pl's Opp'n to Mot. for S.J., Ex. 4, at 78-80.) Blakeslee, however, asks the Court to assume that Whiting-Turner has unfettered access to this contingency fund regardless of how late Blakeslee submitted its notices and supporting calculations. There is no evidence of this.

To the contrary, Whiting-Turner's contract with Yale specifically provided that Whiting-Turner must "promptly notify [Yale] of any and all claims submitted by any Subcontractor or other third party; shall review and evaluate any such claims in consultation with [Yale] and [the architect]; and shall provide evaluations to [Yale] concerning the merits of such claims." (Def's Mot. for S.J., Ex. D, Art. 4.3.2.) As Mr. Giovannone testified, timely notice and calculations from Blakeslee were necessary so that Whiting-Turner could contemporaneously maintain cost

records and other records relevant to Blakeslee's claims. (Giovannone Reply Aff., ¶ 6.)  Without

timely calculations, Whiting-Turner would have been at quite a disadvantage satisfying its

contractual obligations to Yale.

For the above reasons, the Court concludes that, even if Connecticut law applied to this

case, Blakeslee would not be excused from failing to provide timely notice and calculations.[20]

### b.      Estoppel

On several occasions, Whiting-Turner told Blakeslee that it would not entertain claims

for interference and acceleration, delay, or extra work.[21]   In light of Whiting-Turner's

statements, Blakeslee believed that Whiting-Turner would deny its claims without regard to any

facts or calculations that it might present and was, therefore, in no rush to submit its calculations.

---

[20]  Blakeslee argued that, even if Maryland law applies, the Maryland Court of Special Appeals has held (i) that courts must differentiate between whether a notice provision is a condition precedent or a covenant, which requires only substantial compliance, and (ii) that even if the provision is a condition precedent, the court must determine whether the occurrence of that condition was a material part of the agreed exchange.  B&P Enters. v. Overland Equip. Co., 758 A.2d 1026, 1038, 1040 (Md. Ct. Spec. App. 2000).  Blakeslee, however, made no attempt to analyze the notice/substantiation provision in the context of the condition precedent v. covenant distinction or to argue that the provision was not a material part of the Blakeslee Subcontract.

[21]  Chapman Decl., Ex. A ("Whiting-Turner will not entertain requests for additional compensation to pay for overtime to maintain a schedule that was already purchased under the base contract."); id., Ex. B ("Whiting-Turner will not entertain requests from Blakeslee Arpaia Chapman for additional compensation for any overtime or inefficiencies incurred on the project."); id., Ex. C ("Whiting-Turner will not entertain requests for additional compensation for reduced efficiency, removal of staging areas, and prosecuting the work in an inefficient manner.").

(Chapman Decl., ¶ 13.)  Blakeslee argues that Whiting-Turner waived, or should otherwise be estopped from claiming, any contractual right to timely calculations.

Blakeslee cites to two cases, one from Connecticut and one from Maryland, defining the three basic elements of equitable estoppel:  (i) a voluntary representation of one party, (ii) that is relied on by the other party, (iii) to the other party's detriment.  Glazer v. Dress Barn, Inc., 873 A.2d 929, 947 (Conn. 2005); Reichs Ford Rd. Joint Venture v. State Rds. Comm'n, 880 A.2d 307, 321 (Md. 2005).  It is Blakeslee's burden to establish the facts supporting its equitable estoppel defense.  See Reichs Ford, 880 A.2d at 321 ("The party attempting to prove estoppel bears the burden of adducing facts that support its contention.").

Blakeslee, however, has made no effort to analyze the elements of equitable estoppel in the context of this case.[22]  Blakeslee simply stated that, in light of Whiting-Turner's statements, it did not "rush" to prepare its calculations.  (Chapman Decl., ¶ 13.)  There is no evidence, however, that in the absence of Whiting-Turner's statements, Blakeslee would have submitted its calculations on time.  Accordingly, the Court rejects Blakeslee's equitable estoppel/waiver defense.  See Glazer, 873 A.2d at 947 (stating that for equitable estoppel to apply, the party asserting the defense must have changed his position, or done some act that he otherwise would not have done.)

### c.      October 2, 2001 "Claim Book"

---

[22]   The District of Maryland has previously rejected an equitable estoppel defense when a contractor failed to follow the contract's procedure for seeking payment for extra work. See Schiavi v. Mayor & City Council of Baltimore, 40 F. Supp. 184 (D. Md. 1941) (finding no evidence of equitable estoppel in a case in which a contractor's claim for extra compensation was denied by a sewage engineer and the contractor failed to then submit his claim to the Chief Engineer as required by the contract).

In a memorandum dated September 28, 2001, Whiting-Turner asked Blakeslee to submit its outstanding costs for extra work by October 2, 2001 and stated that if it failed to do so, Whiting-Turner would assign its own costs.  (Chapman Decl., Ex. T.)  Blakeslee argues that this letter amended the subcontract and established October 2, 2001 as the new deadline for the submission of calculations related to its extra work claim.  Whiting-Turner, therefore, cannot now take the position that Blakeslee's "claim book," submitted on the October 2, 2001 deadline, was untimely, Blakeslee contends.

No reasonable juror could conclude that the September 28, 2001 memorandum was an amendment to the contract that established October 2, 2001 as the new deadline for submission of Blakeslee's extra work calculations.  The memorandum states that Whiting-Turner had been trying for some time to resolve the outstanding costs and was still waiting for costs associated with ten items of work, which were listed in the letter.  (Chapman Decl., Ex. T.)  According to Whiting-Turner, it had already agreed to pay for those ten pieces of work and was waiting for Blakeslee's costs submissions so that it could close out the contract.[23]  (Giovannone Reply Aff., ¶ 25.)  The memorandum says nothing about waiving or amending the prompt substantiation requirements in the subcontract.

Moreover, even assuming that the memorandum established October 2, 2001 as the new deadline for the submission of all extra work calculations, Blakeslee did not meet the new deadline.  As previously explained, the October 2, 2001 "claim book" was insufficient to satisfy

---

[23]  It appears that Whiting-Turner later paid for at least a portion of the ten items of work referenced in the memorandum.  (See Chapman Decl., Ex. AA (stating that Whiting-Turner approved payment of $87,614.49 of the $1.9 million total that Blakeslee requested in the "claim book").)

the requirements of article 6(e) with respect to Blakeslee's extra work claim.  (See supra Section III.B.1.a.)

## IV.     Conclusion

For the foregoing reasons, the Court will, by separate Order,  (i) GRANT Defendant's motion, (ii) ENTER judgment in favor of Defendant, and (iii) DIRECT the Clerk to CLOSE the case.

Dated this 29th day of March, 2007.

_____/s/_____
Benson Everett Legg
Chief Judge